## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **CRIMINAL ACTION** |
| v. | ) | |
| | ) | **No. 06-20050-11-KHV** |
| ANGELES FIGUEROA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

On March 31, 2006, a grand jury indicted Angeles Figueroa with (1) conspiring to intentionally distribute and possess with intent to distribute five kilograms or more of a mixture and substance containing cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii), all in violation of 21 U.S.C. § 846 (Count 1); and (2) aiding and abetting and knowingly and intentionally possessing with intent to distribute five kilograms or more of a mixture and substance containing cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii) and 18 U.S.C. § 2 (Count 3). This matter is before the Court on defendant's Motion To Suppress Evidence Seized From Car Stop Of Angeles Figueroa (Doc. #107) filed October 23, 2006. On January 23, 2007, the Court held an evidentiary hearing. For reasons stated below, the Court overrules defendant's motion.

### Facts

Based on testimony and exhibits received at the hearing, the Court finds the following facts:

In 2005, the United States Drug Enforcement Agency ("DEA") engaged a task force to investigate a drug organization run by Savino Davila. Tim McCue, special agent with the DEA, worked on the investigation. During the investigation, the DEA determined that Davila's

organization was based in California and distributed cocaine in Kansas City through an individual named Jose Alvarado.  The DEA also learned that Davila used a brown Chevy Malibu with a hidden trap to transport cocaine from Kansas City to St. Louis, Missouri.

In June of 2005, Phyllis Woodill cooperated with the DEA in making a controlled delivery of cocaine to Alvarado in Kansas City.  Davila's organization had recruited Woodill in California and had her travel to El Paso, Texas, where she picked up load vehicles and drove them to Kansas City and Atlanta, Georgia.

On November 1, 2005, the DEA began a federal wiretap on Alvarado's cellular telephone, among others.  During the first week, McCue learned from wiretap interceptions that Alvarado was expecting a woman to bring a shipment of drugs from California to Kansas City.  On the evening of November 6, the DEA intercepted a call which indicated that the woman would arrive around 10:00 p.m. and that Alvarado would meet the woman and guide her back to his house.  The DEA established surveillance at Alvarado's home.  At 10:35 p.m., officers observed a woman drive a green Honda from Alvarado's house to a parking lot on 47th Street in Shawnee, Kansas.[1]  The Honda stopped behind a brown Chevy Malibu which defendant was driving.[2]  The two drivers appeared to communicate and then the Malibu began following the Honda out of the parking lot.  Officers followed both cars north on 47th Street.[3]  At a stop sign, the Honda turned left and slowly traveled westbound on Gibbs Road.  The Malibu turned right and slowly traveled eastbound on

---

[1]     The officers had seen Alvarado drive the car before and it was registered in Alvarado's name.

[2]     Another woman, defendant's eleven-year-old son and defendant's infant son were also in the Malibu.

[3]     The DEA had a team of at least six officers, in six separate cars, involved in the surveillance.

Gibbs.  Both cars traveled at speeds slower than normal.  McCue followed the Malibu, which made an abrupt left turn onto a dead end street.  McCue recognized the maneuver as a counter surveillance technique, i.e. an attempt to see if someone was following the car.  McCue continued eastbound on Gibbs, did a u-turn and returned to the Malibu.  He passed the Malibu and the Malibu began following him westbound on Gibbs.  McCue traveled to 51st Street and turned off.  The Malibu proceeded toward Alvarado's house.[4]  Before reaching Alvarado's street, the Malibu encountered two Kansas City, Kansas patrol cars which were not involved in the DEA investigation.   The Malibu passed the patrol cars and drove directly to Interstate I-35, where it headed southbound. DEA officers continued to follow the Malibu southbound on I-35.

Around 10:50 p.m., the DEA intercepted a call between Alvarado and an individual named Tio, whom they identified as the source of Alvarado's drug supply.  Alvarado told Tio that "the primas [women] just got here, but I don't think they are well" and "they just called . . . and told me that they might go and sleep some place else because they don't feel well."[5]  Alvarado said that "she called already to go and get her, so he leaves to go and get them, and then she calls back to tell me they are going to go to sleep because they don't feel well."  Tio asked if they had arrived yet and Alvarado replied "yes, over here, but not to the house."  Tio suggested that they may have had an "interview" and did not want to stop by.[6]

Based on the intercepted phone calls and surveillance of the Honda and Malibu, McCue believed that the Malibu contained a shipment of narcotics.  McCue notified the Kansas highway

---

[4]       Other officers apparently followed the Malibu at this time.

[5]       Agents believed that Alvarado was speaking in code in attempt to deflect surveillance.

[6]       McCue interpreted "interview" to mean a police stop.

patrol to stop the Malibu.  Around 11:30 p.m., the highway patrol stopped the Malibu on I-35 near

Ottawa, Kansas, about 40 miles south of Kansas City.  DEA officers arrived on the scene shortly

thereafter.  At 11:40 p.m., defendant signed a consent for officers to search her car.[7]  See

Defendant's Exhibit 400.  Officers searched the car manually and with a drug-sniffing dog.  They

found no narcotics, but they decided to secure the vehicle overnight and search for hidden

compartments in the morning.  McCue told defendant that she was free to leave and that he would

call her in the morning with the search results.  Defendant replied that she had no minutes on her

telephone.  Officers then drove defendant and her party to a motel in the Ottawa area.

The next morning, officers applied for and obtained a federal warrant to search defendant's

car.  A comprehensive search revealed two hidden compartments behind the front fenders.  In the

compartments, officers found 14 bricks of cocaine which weighed a total of 10.9 gross kilograms.

## Analysis

Defendant seeks to suppress evidence on the grounds that officers did not have a sufficient

basis to stop her or search her car.  The government responds that it had probable cause to do both.

The Fourth Amendment to the United States Constitution protects persons and their houses, papers

and effects against unreasonable searches and seizures.  See U.S. Const. amend. VI.  Stopping an

automobile and detaining its occupants constitutes a seizure within the meaning of the Fourth

Amendment.  See Delaware v. Prouse, 440 U.S. 648, 653 (1979).  Such a seizure is reasonable,

however, if it is based on probable cause and exigent circumstances.[8]  See United States v. Gama-

---

[7]     It is unclear whether DEA officers arrived before or after defendant signed the consent.

[8]     Only reasonable suspicion is necessary to justify a traffic stop.  See Terry v. Ohio,
(continued...)

Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998).  Probable cause to stop a vehicle exists if based on

the facts and circumstances known at the time, officers reasonably believe that defendant has

committed or is committing an offense.  See United States v. Barnes, No. 00-5077, 5 Fed. Appx.

809, 811 (10th Cir. Feb. 21, 2001).  Probable cause to search a vehicle exists if under the totality of

the circumstances, a fair probability exists that the vehicle contains contraband or evidence.  See

United States v. Bradford, 423 F.3d 1149, 1159 (10th Cir. 2005).  If such probable cause exists,

officers may search a vehicle which has been stopped on the road without first obtaining a search

warrant.  See id. (citing Florida v. Meyers, 466 U.S. 380, 381 (1984) (per curium)).  Under this so-

called "automobile exception," if probable cause justifies the search of a lawfully stopped vehicle,

police can search every part of the vehicle and its contents which may conceal the object of the

search, to the same extent as a magistrate could legitimately authorize by warrant.  See United States

v. Ross, 456 U.S. 798, 825 (1982).

Defendant argues that officers illegally stopped her because "[e]ven if law enforcement was

suspicious because the cars were in close proximity at the parking lot, the Chevy Malibu did not

follow the green Honda back to the Alvarado residence.  As it drove away from Kansas City and the

miles sped by, with no attempt to double back or return to Kansas City, the car had apparently less

and less connection to the investigation."  Memorandum Of Law In Support Of Motion To Suppress

Evidence (Doc. #108) filed October 23, 2006 at 4.  Defendant's argument ignores many key facts.

First, the DEA knew that Davila's organization recruited women to travel from California to El Paso

to pick up load vehicles and drive them to Alvarado in Kansas City.  Moreover, during the first week

---

[8](...continued)
392 U.S. 1 (1968).  The Court does not consider this lesser standard, however, because the
government has shown that probable cause justified the stop.

of November 2005, the DEA learned that Alvarado was expecting a woman to bring a shipment of drugs from California to Kansas City.  On November 6, an intercepted call revealed that the woman would arrive around 10:00 p.m. and that Alvarado would meet the woman and guide her back to his house.  At 10:35 p.m., Alvarado's car left his house, met defendant in a nearby parking lot and defendant began following the car back toward Alvarado's house.  Defendant then engaged in counter surveillance techniques to see if anyone was following her.  After defendant encountered two police cars near Alvarado's home, she drove directly to Interstate I-35 and headed southbound.  Meanwhile, the DEA intercepted phone calls in which Alvarado stated that the women had arrived and called for him to come, but that when he went to get them she called back and said that they were not feeling well and were going somewhere else to sleep.  Based on the intercepted phone calls, defendant's actions in meeting Alvarado's car, following Alvarado's car, engaging in counter surveillance techniques and driving to the interstate when she encountered two police cars near Alvarado's home, officers had probable cause to believe that defendant was driving a load of drugs to Alvarado.  See, e.g., United States v. Soto, 375 F.3d 1219, 1222-23 (10th Cir. 2004); Barnes, 5 Fed. Appx. at 811; Gama-Bastidas, 142 F.3d at 1239-40; United States v. Hernandez, No. 04-20115-JWL, 2006 WL 1232855, at *8 (D. Kan. May 5, 2006).  Accordingly, the stop of defendant's vehicle was lawful.  See Gama-Bastidas, 142 F.3d at 1240.

The same facts also establish probable cause that defendant's car contained contraband.  See, e.g., United States v. Castaneda, 438 F.3d 891, 893 (8th Cir. 2006) (intercepted calls and surveillance provided probable cause that defendant was transporting drugs in vehicle); United States v. Olvera, No. 04-11499, 178 Fed. Appx. 373, 374-75 (5th Cir. Apr. 28, 2006) (same); United States v. Grist, No. 94-6049, 1995 WL 331242, at *4 (10th Cir. June 1, 1995) (intercepted calls

provided probable cause that contraband would be found in truck); United States v. Forcelledo, No. 89-30335, 1990 WL 183692, at *9-10 (9th Cir. Nov. 20, 1990) (telephone interceptions provided probable cause that defendant had come to pick up cocaine); Hernandez, 2006 WL 1232855 at *9. Accordingly, the search of defendant's car was lawful.[9]

Defendant asserts that her consent to search was involuntary.  Because probable cause existed, officers were not required to obtain defendant's consent before searching her car.  See United States v. Alcaraz-Arellano, 441 F.3d 1252, 1261 (10th Cir. 2006).

Defendant argues that police should not have searched her car after the drug-sniffing canine did not alert.  Because the officers already had probable cause to search, however, the drug dog's failure to alert did not deprive them of probable cause.  See United States v. Williams, No. 03-51239, 124 Fed. Appx. 885, 887 (5th Cir. 2005); cf. United States v. Ramirez, 342 F.3d 1210, 1212-13 (10th Cir. 2003) (factors giving rise to reasonable suspicion remain unchanged by negative dog sniff test).

On this record, defendant has not shown that the Court should suppress evidence seized as a result of the car stop and/or search.  See United States v. Moore, 22 F.3d 241, 243 (10th Cir. 1994) (proponent of motion to suppress bears burden of proof).

**IT IS THEREFORE ORDERED** that defendant's Motion To Suppress Evidence Seized From Car Stop Of Angeles Figueroa (Doc. #107) filed October 23, 2006 be and hereby is

---

[9]       The Court notes that although officers obtained a warrant the next morning to search for hidden compartments, they were not required to do so.  See Castaneda, 438 F.3d at 894 (if probable cause exists officers can impound and search car); United States v. Ludwig, 10 F.3d 1523, 1528 (10th Cir. 1993) (warrant not required once probable cause exists to search car); but see Ross, 456 U.S. at 823 n.32 (obtaining warrant protects officers in potential action for damages for unconstitutional search).

**OVERRULED**.

Dated this 1st day of March, 2007, at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge